THOMAS MURPHY, administrator, *vs.* BOSTON AND ALBANY RAILROAD COMPANY.

Hampden.     September 22, 1896. — October 23, 1896.

Present: FIELD, C. J., MORTON, LATHROP, & BARKER, JJ.

*Loss of Life — Railroad — Conjectural Cause and Manner of Death — Action.*

An action cannot be maintained against a railroad corporation for causing the death of a brakeman in its employ, where the cause and manner of his death are purely conjectural.

TORT, by the administrator of the estate of Francis P. Murphy, for causing his death. Trial in the Superior Court, before *Dewey*, J., who allowed a bill of exceptions, in substance as follows.

Murphy was a freight brakeman in the employ of the defendant corporation, running between Springfield and Worcester for several months. On the day of his injury and death, the train upon which he was at work left Springfield about eight o'clock in the morning, and on the return trip left Worcester at about one o'clock in the afternoon. The train was composed of an engine, thirty-five freight cars, and a caboose, and was in charge of a conductor. The crew comprised an engineer, a fireman, a head-end man, one Emery, a middleman, who was Murphy, and the hind-end man. Upon arriving at the West Brookfield station,

Emery went back to the caboose to eat his dinner, and Murphy took his place, according to custom.

Just west of the Warren station there is a down grade to the west, extending about seven miles.   It is the custom of the head-end man to " hold the grade," that is, to set the brakes so as to govern the speed of the train as nearly as possible to fifteen miles an hour while descending the grade.   It was not usual to begin to set the brakes until after the train had passed the bridges mentioned below.   About a quarter of a mile west of Warren, and on the grade above referred to, there is an overhead iron bridge, and about four hundred feet west of that there is a wooden bridge forming part of a highway, under both of which bridges the tracks of the defendant's railroad run.   The height of this bridge was variously estimated at from sixteen to twenty-five feet above the road-bed.   At a point about two hundred feet to the east of the iron bridge were tell-tales, and about midway between the two bridges was another set of tell-tales, stretched across the tracks for the purpose of warning brake-men of their approach to the bridge.   These tell-tales were of wire, about one fourth of an inch in width and about three and a half feet long, and hung on a block of wood extending across the entire west bound track.

While going past the Warren station, the engineer saw Mur-phy sitting upon the brakehead of the car nearest the engine. This car was a grain line car, the top of which was about twelve or thirteen feet above the road-bed.   The brake was on the for-ward end of the car, on the south side, that is, on the southwest corner of the car.   He was observed after that by the engineer just as the train was about to pass under the iron bridge.   He was then standing up straight on the top of the car upon the run-ning board, which is in the middle of the car.   The engineer saw him stoop as he passed the tell-tales over the west bound track.   As Murphy then stood upon the running board he was facing the rear of the train.   The wind was blowing from the west.

Afterwards, when the train had passed under the wooden bridge, the engineer noticed that it began to gain in speed, and turned round to see where Murphy was.   He then saw him lying upon the top of the car on which he had last seen him.

He was some six or eight feet from the forward end of the car, lying with his head and shoulders on the running board, and had a bruised spot, which was very soft and about as large as a man's hand, on the back of his head.

There was evidence tending to show that Murphy was struck by the wooden bridge, and died in consequence.

The distance between the top of the car and the bridge was variously estimated at from three and a half to five feet. Murphy was about five feet and seven or eight inches in height. On the day following the accident, a boy picked up a cap and a pipe at a point under the centre of the wooden bridge. There was some testimony tending to identify the cap as the one that Murphy wore. It was in evidence that when the engineer saw Murphy on the top of the car, after the accident, he did not have his cap on.

There was evidence tending to show that five or six of the strands were missing from the centre of the set of tell-tales which was between the two bridges.

At the close of the evidence, the judge directed the jury to return a verdict for the defendant; and the plaintiff alleged exceptions.

*W. H. McClintock,* for the plaintiff.

*W. H. Brooks,* (*W. Hamilton* with him,) for the defendant.

MORTON, J. The plaintiff was bound to show that the death of his intestate was due to the negligence of the defendant, and that his intestate was in the exercise of due care. In both respects the evidence seems to us to have left the cause and manner of death to conjecture. When last seen alive Murphy was standing on top of a car where his duty required him to be, stooping as he went under the iron bridge. He was discovered after the train had passed the wooden bridge, lying unconscious on top of the car, with a soft spot about the size of the hand, on the back of his head. His cap and a pipe were found under the wooden bridge. The brake of which he had charge was not set. The testimony showed that it was not usual to begin to set the brakes till after the wooden bridge was passed. There was nothing pertaining to his duties which appears especially to have engrossed his attention. The probability is, and the jury would have been justified in so finding, that he

had passed the iron bridge in safety, and that he was struck by the wooden bridge. But what he was doing at the moment, or whether the gap in the tell-tales contributed to the accident, is entirely a matter of surmise. Whether he rose from the stooping posture after passing the iron bridge and before reaching the tell-tales which were midway between the two bridges, or whether he remained stooping till after he had passed under them and then rose, can only be conjectured. If he was standing when he passed under them, it seems hardly possible that he should not have been struck by them notwithstanding the gap, or should not have seen them. The bridges were only four hundred feet apart, and at the speed at which the train was moving — fifteen miles an hour — it would pass over that distance in eighteen or twenty seconds. Due care on the part of the plaintiff's intestate would seem to have required that the stooping posture which he assumed in order to pass under the iron bridge should have been kept till he had passed the wooden bridge. He had run between Worcester and Springfield several months, and must be taken to have known the situation of the bridges; and their proximity to each other was such that the approach of the train to one must necessarily have given him warning of the nearness of the other. We think that the plaintiff has failed to sustain the burden as to due care on the part of his intestate, or negligence on the part of the defendant. *Williams* v. *Delaware, Lackawanna, & Western Railroad*, 116 N. Y. 628. *Corcoran* v. *Boston & Albany Railroad*, 133 Mass. 507. *Riley* v. *Connecticut River Railroad*, 135 Mass. 292. *Tyndale* v. *Old Colony Railroad*, 156 Mass. 503. *Chandler* v. *New York, New Haven, & Hartford Railroad*, 159 Mass. 589. *Geyette* v. *Fitchburg Railroad*, 162 Mass. 549. *Livermore* v. *Fitchburg Railroad*, 163 Mass. 132.

*Exceptions overruled.*